**JENNY L. FOLEY, Ph.D., ESQ.**
Nevada Bar No.: 9017
E-mail:jfoley@hkm.com
**MARTA D. KURSHUMOVA, ESQ.**
Nevada Bar No.: 14728
E-mail:mkurshumova@hkm.com
**HKM EMPLOYMENT ATTORNEYS LLP**
1785 East Sahara, Suite 300
Las Vegas, Nevada 89104
Tel.:   (702) 805-8340
Fax:    (702) 625-3893
*Counsel for Plaintiffs*
*~AND~*
**STUEVE SIEGEL HANSON LLP**
**GEORGE A. HANSON, ESQ.**, *pro hac vice*
Missouri Bar No.: 43450
E-mail: hanson@stuevesiegel.com
**ALEXANDER T. RICKE, ESQ.**, *pro hac vice*
Missouri Bar No.: 65132
E-mail:ricke@stuevesiegel.com
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel.:   (816) 714-7100
Fax:    (816) 714-7101
*Counsel for Plaintiffs*
*~AND~*
**ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| **KRYSTAL LOCKETT, AMBER L. CASWELL, JACQUELINE DAVIS, DAVID C. DEVUN JR., TABATHA K. DOZIER, SETH B. ISTRE, RACAL JOHNSON, CYNTHIA J. KOFRON, TONISHA S. LONZO, NATHAN J. MCDERMOTT, JEREMY MITCHELL, LAURA PEREZ, WAYNE SHEFFIELD JAMAICA S. YOUNG, individually, and on behalf of all others similarly situated,** | **CASE NO. 2:19-CV-00315-APG-NJK** <br><br> **PLAINTIFFS' FIRST AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT AND JURY DEMAND** |
| **Plaintiffs,** | |
| **v.** | |

Case 4:19-cv-00358-GAF   Document 46   Filed 04/24/19   Page 1 of 51

**PINNACLE ENTERTAINMENT, INC.,**

**AMERISTAR CASINO COUNCIL BLUFFS, LLC D/B/A AMERISTAR COUNCIL BLUFFS,**

**AMERISTAR CASINO EAST CHICAGO, LLC D/B/A AMERISTAR EAST CHICAGO,**

**CACTUS PETE'S, LLC D/B/A CACTUS PETE'S RESORT CASINO,**

**LOUISIANA-I GAMING, A LOUISIANA PARTNERSHIP IN COMMENDAM D/B/A BOOMTOWN NEW ORLEANS**

**PNK (BATON ROUGE) PARTNERSHIP D/B/A L'AUBERGE BATON ROUGE,**

**PNK (BOSSIER CITY), L.L.C. D/B/A BOOMTOWN BOSSIER CITY,**

**PNK (LAKE CHARLES), L.L.C. D/B/A L'AUBERGE LAKE CHARLES,**

**PNK (RIVER CITY), LLC D/B/A RIVER CITY,**

**PNK VICKSBURG, LLC D/B/A AMERISTAR VICKSBURG,**

**WASHINGTON TROTTING ASSOCIATION, LLC D/B/A THE MEADOWS,**

**Defendants.**

/// 

/// 

/// 

///

Pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), Plaintiffs have filed this First Amended Complaint, as a matter of right, within 21 days after service of Defendants' responsive pleading and motions under Rule 12(b). *See* ECF Nos. 30-33 (filed April 3, 2019).

Plaintiffs, by and through their undersigned counsel, state and allege as follows for their First Amended Complaint:

## **JURISDICTION AND VENUE**

1. Pursuant to Local Rule 8-1, both subject matter and personal jurisdiction over this action are proper in the United States District Court for the District of Nevada. This Court has subject matter jurisdiction over this case because federal question jurisdiction exists over Plaintiffs' Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*., claims pursuant to 28 U.S.C. § 1331. The Court likewise has subject matter jurisdiction over this case because Plaintiffs' state-law wage and hour claims are so related to the FLSA claims that they form part of the same case and controversy, satisfying supplemental jurisdiction pursuant to 28 U.S.C. § 1367. As explained below, the Court also possesses personal jurisdiction over each Defendant. As such, this Court possesses both subject matter and personal jurisdiction over this action.

2. Personal jurisdiction exists over Defendant Pinnacle Entertainment, Inc. ("Pinnacle").

3. Pinnacle's principal place of business is located in Nevada because that is where Pinnacle's activities are directed, controlled and coordinated. Pinnacle's affiliations with Nevada are so continuous and systematic as to render it essentially at home in Nevada. Pinnacle, therefore, is subject to general (sometimes called "all purpose") personal jurisdiction in Nevada.

4. Moreover, the specific claims at issue in this action arise out of and result from Pinnacle's Nevada-related activities, including Pinnacle's joint employment, with the Pinnacle Subsidiary Defendants, of Plaintiffs and other similarly situated employees, and their collective establishment, maintenance and administration from Nevada of the specific

unlawful policies and practices challenged in this action. The exercise of specific personal jurisdiction over Pinnacle comports with fair play and substantial justice because it is reasonable for Pinnacle to be sued in Nevada given that the specific claims at issue in this action arise out of and result from Pinnacle's purposeful Nevada-related activities. Pinnacle, therefore, is subject to specific (sometimes called "case-linked") personal jurisdiction in Nevada.

5. The Pinnacle Subsidiary Defendants — (1) Cactus Pete's, LLC; (2) Ameristar Casino Council Bluffs, LLC; (3) Ameristar Casino East Chicago, LLC; (4) Louisiana-I Gaming, A Louisiana Partnership in Commendam; (5) PNK (Baton Rouge) Partnership; (6) PNK (Bossier City), LLC; (7) PNK (Lake Charles), LLC; (8) PNK (River City) LLC; (9) PNK Vicksburg, LLC; and (10) Washington Trotting Association, LLC — are not separate or distinct from their parent company Pinnacle. Pinnacle wholly owns the Pinnacle Subsidiary Defendants. Pinnacle dominates and controls all aspects of the policies, internal affairs and daily operations of the Pinnacle Subsidiary Defendants, including as to the specific policies and practices challenged in this action. Pinnacle treats the Pinnacle Subsidiary Defendants as mere departments or instrumentalities of Pinnacle, and fails to meaningfully observe corporate formalities. The Pinnacle Subsidiary Defendants lack any semblance of true independence from Pinnacle, resulting in the Pinnacle Subsidiary Defendants being the alter egos of Pinnacle. Given Defendants' choice to operate their business in this manner, disregarding the "separate" identity of the Pinnacle Subsidiary Defendants is consistent with principles of justice and fairness, and a failure to disregard their "separate" identity would result in fraud and injustice. Thus, it is proper to extend personal jurisdiction over the Pinnacle Subsidiary Defendants by attributing Pinnacle's Nevada-based contacts to the Pinnacle Subsidiary Defendants or otherwise fusing Pinnacle and the Pinnacle Subsidiary Defendants together for jurisdictional purposes, which establishes both general and specific personal jurisdiction over the Pinnacle Subsidiary Defendants in Nevada.

6. Personal jurisdiction exists over Defendant Cactus Pete's, LLC (Cactus Pete's).

7.  Cactus Pete's is organized under the laws of and registered to do business in Nevada.  Cactus Pete's principal place of business is located in Nevada because that is where Cactus Pete's activities are directed, controlled and coordinated.  Cactus Pete's has been and continues to be engaged in continuous corporate operations within Nevada, including through its ownership and operation of the Cactus Pete's Resort Casino located in Jackpot, Nevada.  Cactus Pete's affiliations with Nevada are so continuous and systematic as to render it essentially at home in Nevada. Cactus Pete's, therefore, is subject to general personal jurisdiction in Nevada.

8.  Moreover, the specific claims at issue in this action arise out of and result from Cactus Pete's Nevada-related activities, including its joint employment with Pinnacle of individuals employed at the Cactus Pete's Resort Casino, which include Plaintiff Caswell and other similarly situated employees.  Cactus Pete's and Pinnacle collectively established, maintained and administered in Nevada the unlawful policies and practices challenged in this action.  The exercise of specific personal jurisdiction over Cactus Pete's comports with fair play and substantial justice because it is reasonable for Cactus Pete's to be sued in Nevada given that the specific claims at issue in this action arise out of and result from Cactus Pete's purposeful Nevada-related activities. Cactus Pete's, therefore, is subject to specific personal jurisdiction in Nevada.

9.  Personal jurisdiction exists over the remaining Pinnacle Subsidiary Defendants (1) Ameristar Casino Council Bluffs, LLC; (2) Ameristar Casino East Chicago, LLC; (3) Louisiana-I Gaming, A Louisiana Partnership in Commendam; (4) PNK (Baton Rouge) Partnership; (5) PNK (Bossier City), L.L.C.; (6) PNK (Lake Charles), L.L.C.; (7) PNK (River City) LLC; (8) PNK Vicksburg, LLC; and (9) Washington Trotting Association, LLC.

10.  The Pinnacle Subsidiary Defendants (other than Cactus Pete's) are organized or formed under the laws of States other than Nevada.  The Pinnacle Subsidiary Defendants (other than Cactus Pete's) ostensibly claim that their principal place of business is outside Nevada.  However, the Pinnacle Subsidiary Defendants are not separate or distinct from their

parent company Pinnacle. Pinnacle wholly owns the Pinnacle Subsidiary Defendants. Pinnacle dominates and controls all aspects of the policies, internal affairs and daily operations of the Pinnacle Subsidiary Defendants. Pinnacle treats the Pinnacle Subsidiary Defendants as mere departments or instrumentalities of Pinnacle, and fails to meaningfully observe corporate formalities. The Pinnacle Subsidiary Defendants lack any semblance of true independence from Pinnacle, resulting in the Pinnacle Subsidiary Defendants being the alter egos of Pinnacle. Given Defendants choice to operate their business in this manner, disregarding the "separate" identity of the Pinnacle Subsidiary Defendants is consistent with principles of justice and fairness, and a failure to disregard their "separate" identity would result in fraud and injustice. Accordingly, the Pinnacle Subsidiary Defendants' principal place of business is in Nevada as part of Pinnacle's Nevada-based operations, which is where the Pinnacle Subsidiary Defendants' activities are directed, controlled and coordinated. Thus, the Pinnacle Subsidiary Defendants' affiliations with Nevada are so continuous and systematic as to render them essentially at home in Nevada. The Pinnacle Subsidiary Defendants, therefore, are subject to general personal jurisdiction in Nevada.

11. Specific personal jurisdiction also exists over the Pinnacle Subsidiary Defendants. The activities of the Pinnacle Subsidiary Defendants, including the establishment, maintenance and administration of the specific unlawful policies and practices challenged in this action, have all been principally directed, controlled and coordinated from Nevada. The Pinnacle Subsidiary Defendants and Pinnacle collectively established, maintained and administered in Nevada the specific unlawful policies and practices challenged in this action. The Pinnacle Subsidiary Defendants and Pinnacle also together formed a joint employment relationship (a subject matter of Plaintiffs' specific claims in this action) with respect to Plaintiffs and other similarly situated employees, which (1) conferred in Nevada the power to hire and fire Plaintiffs and other similarly situated employees; (2) resulted in supervision and control from Nevada over the work schedules, terms and conditions of employment, and manner in which Plaintiffs and other similarly situated employees performed their jobs; (3)

resulted in the rates and methods of payment for Plaintiffs and other similarly situated employees being determined, established, maintained and administered in Nevada, including as to the specific policies and practices challenged in this action; and (4) resulted in the creation and maintenance of employment records and the handling of payroll and human resources matters for Plaintiffs and other similarly situated employees in Nevada, including the specific payroll, time records and policies / practices at issue in this action. Thus, Pinnacle and the Pinnacle Subsidiary Defendants together purposefully availed themselves of the privilege of conducting activities in Nevada. The specific claims at issue in this action arise out of and result from the Pinnacle Subsidiary Defendants' Nevada-related activities because but for these Nevada-related activities, the claims of Plaintiffs and others similarly situated would not have arisen. The exercise of specific personal jurisdiction over the Pinnacle Subsidiary Defendants comports with fair play and substantial justice because it is reasonable for the Pinnacle Subsidiary Defendants to be sued in Nevada given that the specific claims at issue in this action arise out of and result from the Pinnacle Subsidiary Defendants' purposeful Nevada-related activities. It is also reasonable for the Pinnacle Subsidiary Defendants to anticipate being haled into a Nevada forum due to the nature of their relationship with Nevada-based Pinnacle. The Pinnacle Subsidiary Defendants, therefore, are subject to specific personal jurisdiction in Nevada.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1-2) because all Defendants are residents of the State of Nevada (given that all Defendants are subject to personal jurisdiction in Nevada, they are deemed residents of Nevada) and because a substantial part of the events or omissions giving rise to the claims set forth herein occurred in Nevada.

13.     In addition, Pinnacle and the Pinnacle Subsidiary Defendants have, pursuant to 28 U.S.C. § 1404(a), given their consent to transfer this action and litigate the claims at issue in the United States District Court for the Western District of Missouri. (ECF No. 31 at p.16 n.12, p.18). Therefore, in the event this action is transferred to the Western District of

Case 4:19-cv-00358-GAF   Document 46   Filed 04/24/19   Page 7 of 51

Missouri, venue is also proper and personal jurisdiction also exists over Pinnacle and the Pinnacle Subsidiary Defendants in the United States District Court for the Western District of Missouri.

**THE PARTIES**

**The Named Plaintiffs**

14.     Plaintiff Krystal Lockett is a resident of the State of Nebraska.   From approximately September 2014 until March 2019, Plaintiff Lockett was employed as a table games dealer by Defendant Pinnacle Entertainment, Inc. and Defendant Ameristar Casino Council Bluffs, LLC d/b/a Ameristar Council Bluffs at a casino property located in Council Bluffs, Iowa.  Plaintiff Lockett's Consent to Be a Party Plaintiff pursuant to 29 U.S.C. § 216(b) has previously been filed in this action. *See* Complaint at Ex. 1, ECF No. 1 at 48-49 (a copy of which is also attached and incorporated into to this First Amended Complaint).

15.     Plaintiff Nathan J. McDermott is a resident of the State of Pennsylvania. From approximately April 2016 until August 2017, Plaintiff McDermott was employed as a table games dealer by Defendant Pinnacle Entertainment, Inc. and Defendant Washington Trotting Association, LLC d/b/a The Meadows at a casino property located in Washington, Pennsylvania.  Plaintiff McDermott's Consent to Be a Party Plaintiff pursuant to 29 U.S.C. § 216(b) has previously been filed in this action. *See* Complaint at Ex. 2, ECF No. 1 at 50-51 (a copy of which is also attached and incorporated into to this First Amended Complaint).

16.     Plaintiff Tabatha K. Dozier is a resident of the State of Mississippi. From approximately May 2016 until April 2018, Plaintiff Dozier was employed as a table games dealer by Defendant Pinnacle Entertainment, Inc. and Defendant PNK Vicksburg, LLC d/b/a Ameristar Vicksburg at a casino property located in Vicksburg, Mississippi.  Plaintiff Dozier's Consent to Be a Party Plaintiff pursuant to 29 U.S.C. § 216(b) has previously been filed in this action. *See* Complaint at Ex. 3, ECF No. 1 at 52-53 (a copy of which is also attached and incorporated into to this First Amended Complaint).

17.     Plaintiff Amber L. Caswell is a resident of the State of Nevada. From approximately April 2015 until November 2017, Plaintiff Caswell was employed as a table games dealer by Defendant Pinnacle Entertainment, Inc. and Defendant Cactus Pete's, LLC d/b/a Cactus Pete's Resort Casino at a casino property located in Jackpot, Nevada. Plaintiff Caswell's Consent to Be a Party Plaintiff pursuant to 29 U.S.C. § 216(b) has previously been filed in this action. *See* Complaint at Ex. 4, ECF No. 1 at 54-55 (a copy of which is also attached and incorporated into to this First Amended Complaint).

18.     Plaintiff David C. DeVun, Jr. is a resident of the State of Louisiana. From approximately September 2012 until December 2017, Plaintiff DeVun was employed as a table games dealer by Defendant Pinnacle Entertainment, Inc. and Defendant PNK (Baton Rouge) Partnership d/b/a L'Auberge Baton Rouge at a casino property located in Baton Rouge, Louisiana. Plaintiff DeVun's Consent to Be a Party Plaintiff pursuant to 29 U.S.C. § 216(b) has previously been filed in this action. *See* Complaint at Ex. 5, ECF No. 1 at 56-57 (a copy of which is also attached and incorporated into to this First Amended Complaint).

19.     Plaintiff Tonisha S. Lonzo is a resident of the State of Louisiana. From approximately June 2013 until May 2018, Plaintiff Lonzo was employed as a table games dealer by Defendant Pinnacle Entertainment, Inc. and Defendant Louisiana-I Gaming, a Louisiana Partnership in Commendam, d/b/a Boomtown New Orleans at a casino property located in New Orleans, Louisiana. Plaintiff Lonzo's Consent to Be a Party Plaintiff pursuant to 29 U.S.C. § 216(b) has previously been filed in this action. *See* Complaint at Ex. 6, ECF No. 1 at 58-59 (a copy of which is also attached and incorporated into to this First Amended Complaint).

20.     Plaintiff Seth B. Istre is a resident of the State of Louisiana. From approximately April 2005 until July 2018, Plaintiff Istre was employed as a table games dealer by Defendant Pinnacle Entertainment, Inc. and Defendant PNK (Lake Charles), L.L.C. d/b/a L'Auberge Lake Charles at a casino property located in Lake Charles, Louisiana. Plaintiff Istre's Consent to Be a Party Plaintiff pursuant to 29 U.S.C. § 216(b) has previously been filed

in this action. *See* Complaint at Ex. 7, ECF No. 1 at 60-61 (a copy of which is also attached and incorporated into to this First Amended Complaint).

21.    Plaintiff Jeremy Mitchell is a resident of the State of Indiana.  From approximately September 2015 until March 2018, Plaintiff Mitchell was employed as a table games dealer by Defendant Pinnacle Entertainment, Inc. and Defendant Ameristar Casino East Chicago, LLC d/b/a Ameristar East Chicago at a casino property located in East Chicago, Indiana.  Plaintiff Mitchell's Consent to Be a Party Plaintiff pursuant to 29 U.S.C. § 216(b) has previously been filed in this action. *See* Complaint at Ex. 8, ECF No. 1 at 62-63 (a copy of which is also attached and incorporated into to this First Amended Complaint).

22.    Plaintiff Jacqueline Davis is a resident of the State of Louisiana.  From approximately 1996 through the present, Plaintiff Davis has been employed as a table games dealer by Defendant Pinnacle Entertainment, Inc. and Defendant PNK (Bossier City), L.L.C. d/b/a Boomtown Bossier City at a casino property located in Bossier City, Louisiana.  Plaintiff Davis' Consent to Be a Party Plaintiff pursuant to 29 U.S.C. § 216(b) has previously been filed in this action. *See* Complaint at Ex. 9, ECF No. 1 at 64-65 (a copy of which is also attached and incorporated into to this First Amended Complaint).

23.    Plaintiff Jamaica S. Young is a resident of the State of Nebraska.  From approximately May 2016 through the present, Plaintiff Young has been employed as a table games dealer by Defendant Pinnacle Entertainment, Inc. and Defendant Ameristar Casino Council Bluffs, LLC at a casino property located in Council Bluffs, Iowa.  Plaintiff Young's Consent to Be a Party Plaintiff pursuant to 29 U.S.C. § 216(b) has previously been filed in this action. *See* Complaint at Ex. 10, ECF No. 1 at 66-67 (a copy of which is also attached and incorporated into to this First Amended Complaint).

24.    Plaintiff Laura Perez is a resident of the State of Indiana.  From approximately March 2015 through March 2017, Plaintiff Perez was employed as a table games dealer by Defendant Pinnacle Entertainment, Inc. and Defendant Ameristar Casino East Chicago, LLC at a casino property located in East Chicago, Indiana.  Plaintiff Perez's Consent to Be a Party

Plaintiff pursuant to 29 U.S.C. § 216(b) has previously been filed in this action. *See* Complaint at Ex. 11, ECF No. 1 at 68-69 (a copy of which is also attached and incorporated into to this First Amended Complaint).

25.     Plaintiff Cynthia J. Kofron is a resident of the State of Missouri.  From approximately February 2010 through February 2018, Plaintiff Kofron was employed as a table games dealer by Defendant Pinnacle Entertainment, Inc. and Defendant PNK (River City), LLC at a casino property located in Lemay (South St. Louis County), Missouri. Plaintiff Kofron's Consent to Be a Party Plaintiff pursuant to 29 U.S.C. § 216(b) has previously been filed in this action. *See* Complaint at Ex. 12, ECF No. 1 at 70-71 (a copy of which is also attached and incorporated into to this First Amended Complaint).

26.     Plaintiff Racal Johnson is a resident of the State of Louisiana.  From approximately July 2015 through February 2018, Plaintiff Johnson was employed as a table games dealer by Defendant Pinnacle Entertainment, Inc. and Defendant PNK (Bossier City), L.L.C. d/b/a Boomtown Bossier City at a casino property located in Bossier City, Louisiana. Plaintiff Johnson's Consent to Be a Party Plaintiff pursuant to 29 U.S.C. § 216(b) has previously been filed in this action. *See* Complaint at Ex. 13, ECF No. 1 at 72-73 (a copy of which is also attached and incorporated into to this First Amended Complaint).

27.     Plaintiff Wayne Sheffield is a resident of the State of Nebraska.  From approximately June 2013 through the present, Plaintiff Sheffield has been employed as a table games dealer by Defendant Pinnacle Entertainment, Inc. and Defendant Ameristar Casino Council Bluffs, LLC d/b/a Ameristar Council Bluffs at a casino property located in Council Bluffs, Iowa.  Plaintiff Sheffield's Consent to Be a Party Plaintiff pursuant to 29 U.S.C. § 216(b) has previously been filed in this action. *See* Complaint at Ex. 14, ECF No. 1 at 74-75 (a copy of which is also attached and incorporated into to this First Amended Complaint).

**The Defendants**

28.     Defendant Pinnacle Entertainment, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 3980 Howard

Hughes Parkway, Las Vegas, Nevada 89169. Pinnacle is registered to do business and does business in the State of Nevada. According to its 2017 Form 10-K filed with the Securities and Exchange Commission, Pinnacle owns and operates each of the Pinnacle Subsidiary Defendants named in this First Amended Complaint.[1] This Defendant is represented by counsel in this lawsuit and can be served with this First Amended Complaint through its counsel of record via the United States District Court for the District of Nevada's CM/ECF system.

29. Defendant Ameristar Casino Council Bluffs, LLC is a limited liability company organized under the laws of the State of Iowa. Together with and at the direction of Pinnacle Entertainment, Inc., Ameristar Casino Council Bluffs, LLC owns and operates Ameristar Council Bluffs, which is a casino located in Council Bluffs, Iowa. Ameristar Casino Council Bluffs, LLC is owned, operated, and controlled by Pinnacle Entertainment, Inc. This Defendant is represented by counsel in this lawsuit and can be served with this First Amended Complaint through its counsel of record via the United States District Court for the District of Nevada's CM/ECF system.

30. Defendant Ameristar Casino East Chicago, LLC is a limited liability company organized under the laws of the State of Indiana. Together with and at the direction of Pinnacle Entertainment, Inc., Ameristar Casino East Chicago, LLC owns and operates Ameristar East Chicago, which is a casino located in East Chicago, Indiana. The sole member of Ameristar Casino East Chicago, LLC is Ameristar East Chicago Holdings, LLC, which is a limited liability company organized under the laws of the State of Indiana. The sole member of Ameristar East Chicago Holdings, LLC is Pinnacle MLS, LLC. Pinnacle MLS, LLC is a Delaware limited liability company and its sole member is Pinnacle Entertainment, Inc.

---

[1] https://investors.pnkinc.com/static-files/4cb00786-13e3-425d-af7c-4a8cddb88f4e (last visited February 21, 2019).

Ameristar Casino East Chicago, LLC is owned, operated, and controlled by Pinnacle Entertainment, Inc. This Defendant is represented by counsel in this lawsuit and can be served with this First Amended Complaint through its counsel of record via the United States District Court for the District of Nevada's CM/ECF system.

31.    Defendant Cactus Pete's, LLC is a limited liability company organized under the laws of and registered to do business in the State of Nevada.  Together with and at the direction of Pinnacle Entertainment, Inc., Cactus Pete's, LLC owns and operates Cactus Pete's Resort Casino, which is a casino located in Jackpot, Nevada.  Upon information and belief, Pinnacle MLS, LLC is the sole member of Cactus Pete's, LLC.  Pinnacle MLS, LLC is a Delaware limited liability company and its sole member is Pinnacle Entertainment, Inc. Cactus Pete's, LLC is owned, operated, and controlled by Pinnacle Entertainment, Inc. This Defendant is represented by counsel in this lawsuit and can be served with this First Amended Complaint through its counsel of record via the United States District Court for the District of Nevada's CM/ECF system.

32.    Defendant Louisiana-I Gaming is a Louisiana Partnership in Commendam. Together with and at the direction of Pinnacle Entertainment, Inc., Louisiana-I Gaming owns and operates Boomtown New Orleans, which is a casino located in Harvey, Louisiana. Louisiana-I Gaming has two partners: Boomtown, LLC and Pinnacle MLS, LLC.  Boomtown, LLC and Pinnacle MLS, LLC are both Delaware limited liability companies and the sole member of each is Pinnacle Entertainment, Inc.  Louisiana-I Gaming is owned, operated, and controlled by Pinnacle Entertainment, Inc. This Defendant is represented by counsel in this lawsuit and can be served with this First Amended Complaint through its counsel of record via the United States District Court for the District of Nevada's CM/ECF system.

33.    Defendant PNK (Baton Rouge) Partnership is a partnership organized under the laws of the State of Louisiana.  Together with and at the direction of Pinnacle Entertainment, Inc., PNK (Baton Rouge) Partnership owns and operates L'Auberge Baton Rouge, which is a casino located in Baton Rouge, Louisiana.  PNK (Baton Rouge) Partnership has two partners:

PNK Development 9, LLC and PNK Development 8, LLC. PNK Development 9, LLC and PNK Development 8, LLC are both Delaware limited liability companies and the sole member of each is Pinnacle MLS, LLC. Pinnacle MLS, LLC is a Delaware limited liability company and its sole member is Pinnacle Entertainment, Inc. PNK (Baton Rouge) Partnership is owned, operated, and controlled by Pinnacle Entertainment, Inc. This Defendant is represented by counsel in this lawsuit and can be served with this First Amended Complaint through its counsel of record via the United States District Court for the District of Nevada's CM/ECF system.

34.    Defendant PNK (Bossier City), L.L.C. is a limited liability company organized under the laws of the State of Louisiana. Together with and at the direction of Pinnacle Entertainment, Inc., PNK (Bossier City), L.L.C. owns and operates Boomtown Bossier City, which is a casino located in Bossier City, Louisiana. According to the Louisiana Secretary of State, PNK (Bossier City), L.L.C.'s mailing address is 3980 Howard Hughes Parkway, Las Vegas, Nevada 89169. In addition, PNK (Bossier City), L.L.C.'s sole member is an entity called Casino Magic, LLC, which is located at 3980 Howard Hughes Parkway, Las Vegas, Nevada 89169. PNK (Bossier City), L.L.C. is owned, operated, and controlled by Pinnacle Entertainment, Inc. This Defendant is represented by counsel in this lawsuit and can be served with this First Amended Complaint through its counsel of record via the United States District Court for the District of Nevada's CM/ECF system.

35.    Defendant PNK (Lake Charles), L.L.C. is a limited liability company organized under the laws of the State of Louisiana. Together with and at the direction of Pinnacle Entertainment, Inc., PNK (Lake Charles), L.L.C. owns and operates L'Auberge Lake Charles, which is a casino located in Lake Charles, Louisiana. According to the Louisiana Secretary of State, PNK (Lake Charles), L.L.C.'s mailing address is 3980 Howard Hughes Parkway, Las Vegas, Nevada 89169. Pinnacle MLS, LLC is the sole member of PNK (Lake Charles), L.L.C. Pinnacle MLS, LLC is a Delaware limited liability company and its sole member is Pinnacle Entertainment, Inc. PNK (Lake Charles), L.L.C. is owned, operated, and controlled

by Pinnacle Entertainment, Inc. This Defendant is represented by counsel in this lawsuit and can be served with this First Amended Complaint through its counsel of record via the United States District Court for the District of Nevada's CM/ECF system.

36.     Defendant PNK (River City), LLC is a limited liability company organized under the laws of the State of Missouri.  Together with and at the direction of Pinnacle Entertainment, Inc., PNK (River City), LLC owns and operates River City, which is a casino located in Lemay, Missouri (in South St. Louis County, Missouri).  According to the Missouri Secretary of State, PNK (River City), LLC's mailing address is 3980 Howard Hughes Parkway, Las Vegas, Nevada 89169.  Upon information and belief, Pinnacle MLS, LLC is the sole member of PNK (River City), LLC.  Pinnacle MLS, LLC is a Delaware limited liability company and its sole member is Pinnacle Entertainment, Inc.  PNK (River City), LLC is owned, operated, and controlled by Pinnacle Entertainment, Inc. This Defendant is represented by counsel in this lawsuit and can be served with this First Amended Complaint through its counsel of record via the United States District Court for the District of Nevada's CM/ECF system.

37.     Defendant PNK Vicksburg, LLC is a limited liability company organized under the laws of the State of Mississippi.  Together with and at the direction of Pinnacle Entertainment, Inc., PNK Vicksburg, LLC owns and operates Ameristar Casino Vicksburg, which is a casino located in Vicksburg, Mississippi.  According to the Mississippi Secretary of State, PNK Vicksburg, LLC's principal office address is 3980 Howard Hughes Parkway, Las Vegas, Nevada 89169.  Pinnacle MLS, LLC is the sole member of PNK Vicksburg, LLC. Pinnacle MLS, LLC is a Delaware limited liability company and its sole member is Pinnacle Entertainment, Inc.  PNK Vicksburg, LLC is owned, operated, and controlled by Pinnacle Entertainment, Inc. This Defendant is represented by counsel in this lawsuit and can be served with this First Amended Complaint through its counsel of record via the United States District Court for the District of Nevada's CM/ECF system.

38.     Defendant Washington Trotting Association, LLC is a limited liability company organized under the laws of the State of Delaware.  Together with and at the direction of Pinnacle Entertainment, Inc., Washington Trotting Association, LLC owns and operates The Meadows, which is a racetrack and casino located in Washington, Pennsylvania. PNK Development 33, LLC is the sole member of Washington Trotting Association, LLC. PNK Development 33, LLC is a Delaware limited liability company and its sole member is Pinnacle Entertainment, Inc.   Washington Trotting Association, LLC is owned, operated, and controlled by Pinnacle Entertainment, Inc. This Defendant is represented by counsel in this lawsuit and can be served with this First Amended Complaint through its counsel of record via the United States District Court for the District of Nevada's CM/ECF system.

## PINNACLE EMPLOYED EACH PLAINTIFF

39.     Pinnacle operates a hub and spoke employment structure whereby, Pinnacle, at the operational center of the wheel, has spokes leading out to each of its individual casino subsidiaries (each Defendant other than Pinnacle is one of the Pinnacle Subsidiary Defendants).  By design, each individual Pinnacle Subsidiary Defendant is the acknowledged employer of the employees, like Plaintiffs, who physically work at the casino property associated with each Pinnacle Subsidiary Defendant.  However, in reality, from its position at the operational center of this structure, Pinnacle has the ability to and, in fact, does operate its casinos and instructs the Pinnacle Subsidiary Defendants on how and when to execute employment policies.  The Pinnacle Subsidiary Defendants must and do follow Pinnacle's operational instructions.  Due to the pervasive control Pinnacle has exercised and continues to exercise over the employees at each of its casinos (both directly and indirectly), Pinnacle is a joint employer of Plaintiffs and all others similarly situated, along with each respective Pinnacle Subsidiary Defendant.

40.     There is no material difference between the manner in which Pinnacle treats each of the Pinnacle Subsidiary Defendants or the Plaintiffs (and those who are similarly situated to them) who work at each of the Pinnacle casino properties associated with the

Pinnacle Subsidiary Defendants. Each of the Pinnacle Subsidiary Defendants is akin to a regional office of Pinnacle's nationwide gaming operation with Pinnacle in control and directing the policies and procedures across the country that affect the day-to-day lives of the Plaintiffs (and those who are similarly situated).

41. At all relevant times, Pinnacle, with and through the respective Pinnacle Subsidiary Defendants who acknowledges employing each Plaintiff, jointly employed each Plaintiff (and other similarly situated employees) because:

a. Pinnacle, with and through the respective Pinnacle Subsidiary Defendant where each Plaintiff worked, had the right to and did exercise control over the hiring and firing of Plaintiffs and all other similarly situated employees;

b. Pinnacle, with and through the respective Pinnacle Subsidiary Defendant where each Plaintiff worked, had the right to and did supervise the work schedules, conditions of employment, and the manner in which Plaintiffs and all other similarly situated employees performed their jobs;

c. Pinnacle, with and through the respective Pinnacle Subsidiary Defendant where each Plaintiff worked, had the right to and did determine the rate and method of payment for Plaintiffs and all other similarly situated employees; and

d. Pinnacle, with and through the respective Pinnacle Subsidiary Defendant where each Plaintiff worked, was primarily responsible for and did maintain the employment records for Plaintiffs and all other similarly situated employees.

///
///
///

## OVERVIEW OF PLAINTIFFS' CLAIMS

### Overview of Defendants' Violations of the FLSA's Tip Pooling Provisions

42.     Plaintiffs are table games dealers who participate in mandatory tip pooling arrangements at Pinnacle casinos associated with the Pinnacle Subsidiary Defendants. Defendants have operated an unlawful tip pooling arrangement in violation of the FLSA by including a category of employees commonly referred to as "Dual-Rate Supervisors" in the tip pool as explained below.

43.     Pinnacle has established a uniform or substantially similar Paid Time Off ("PTO") policy that governs PTO for hourly employees at its casinos, including the casinos associated with the Pinnacle Subsidiary Defendants.

44.     Pinnacle's PTO policy provides that PTO hours accrue for every hour worked based on the employee's length of service with Pinnacle according to a set schedule.

45.     Pinnacle and the Pinnacle Subsidiary Defendants jointly employ certain workers under the job title "Dual-Rate Supervisor" (or its equivalent by any other name), which includes employment in two occupations:  (1) floor supervisor; and (2) table games dealer. The Department of Labor refers to this type of employment as a "dual job" situation.

46.     With respect to their employment as a floor supervisor (a non-tipped occupation), these employees are paid a regularly hourly rate (say, $19 per hour).  Defendants classify full-time floor supervisors (who perform the same job duties as dual rate supervisors when Dual-Rate Supervisors are functioning in their floor supervisor role) as exempt pursuant to the executive and/or administrative exemption. Hours worked in their employment as a floor supervisor are specifically tracked and separately paid as such in Defendants' timekeeping and payroll records.

47.     With respect to Dual-Rate Supervisors' employment as a table games dealer (a tipped occupation that participates in a mandatory tip pooling arrangement with Plaintiffs and other similarly situated employees), Defendants pay a sub-minimum direct cash wage. Under the FLSA, the sub-minimum direct cash wage must be at least $2.13 per hour, and the

employer is able to count a limited amount of the employee's tips (as re-distributed by the employer to the employee under a valid tip pooling arrangement) as a partial credit to satisfy the difference between the direct cash wage and the required federal minimum wage (known as a "tip credit"), *see* 29 U.S.C. § 203(m)(2)(A). The credit allowed on account of tips may be less than that permitted by statute, but it cannot be more. To illustrate, if Defendants pay a table games dealer a sub-minimum direct cash wage of say $4.25 per hour, the amount of the "tip credit" would be $3 (the difference between the employee's direct cash wage of $4.25 and the federal minimum wage of $7.25) – on the assumption further that the amount of tips actually received by the tipped employee (as re-distributed by Defendants according to the mandatory tip pooling arrangement) is enough to make up the difference between the employee's direct cash wage and the federal minimum wage; if not, Defendants must make up the difference to ensure the employee is paid at least the required minimum wage for all hours worked in their employment as a table games dealer.

48. Under the FLSA, when an employer employs someone in both a tipped and non-tipped occupation, the tip credit is available only for the hours the employee works in the tipped occupation. Thus, for Defendants' Dual-Rate Supervisors, the hours worked in the tipped occupation (table games dealer) must be tracked and paid separately from the hours worked in the non-tipped occupation (floor supervisor).

49. When Defendants' Dual-Rate Supervisors take PTO, Defendants' uniform or substantially similar policy or practice is that Dual-Rate Supervisors are paid on the false assumption that they are employed only as a table games dealer and that they accrued all of their PTO hours while working as a table games dealer, even though many (likely most or in some cases nearly all) of these employees' PTO hours were accrued in their employment as a floor supervisor. PTO hours accrued in their employment as a floor supervisor (a non-tipped occupation and, according to Defendants, a position whose duties qualify as exempt under the administrative and executive exemptions) are not properly included in any valid tip pooling

arrangement among table games dealers (like Plaintiffs). But that is precisely what Defendants are doing for their own economic benefit and to the detriment of these employees.

50. To illustrate, under Defendants' uniform or substantially similarly policy or practice, Defendants pay Dual-Rate Supervisors their PTO by only paying them the sub-minimum direct cash wage applicable to their employment as a table games dealer (in the above example, $4.25 per hour – rather than the $19.00 per hour that applies to them in their employment as a floor supervisor), plus directing that all of their PTO hours be included as part of the mandatory tip pooling arrangement among Defendants' table games dealers, which results in Defendants unlawfully redistributing a portion of the table games dealers' tips (including those earned by Plaintiffs) to improperly pay for PTO hours that Dual-Rate Supervisors accrue in their employment as a floor supervisor (a non-tipped occupation and, according to Defendants, a position whose duties qualify as exempt under the administrative and executive exemption).

51. Defendants also unlawfully redistribute a portion of the table games dealers' tips to Dual-Rate Supervisors when they are paid for such things as jury duty, bereavement leave, sick leave, FMLA leave, and the like, which accrue and/or are paid in the same or substantially similar unlawful manner as the PTO described above. To the extent Dual-Rate Supervisors accrue such additional paid leave in their employment as a floor supervisor, those hours cannot be included as part of any valid tip pooling arrangement among table games dealers.

52. Defendants' above-described scheme for the payment of PTO hours (and other forms of paid leave) for Dual-Rate Supervisors is unlawful and violates the FLSA's tip-pooling provisions because (1) Defendants are violating the FLSA's requirement that all tips received by the tipped employee must be retained by the employee except for a valid tip pooling arrangement; (2) Defendants are violating the FLSA's prohibition against the pooling of tips among employees who do not customarily and regularly receive tips; and (3) Defendants are violating the FLSA's requirement that it "not keep tips received by its

employees for any purposes, including allowing managers or supervisors to keep any portion of the employees' tips, regardless of whether or not the employer takes a tip credit" – *see* 29 U.S.C. § 203(m), as amended by the Consolidated Appropriations Act, 2018 (signed March 23, 2018), along with such section as was in effect prior to then, and all applicable regulations (as the position title Dual-Rate Supervisor and Floor Supervisor confirm, when Dual-Rate Supervisors are performing their non-tipped supervisory duties they are "managers or supervisors" within the meaning of the FLSA).

53. Defendants' above-described scheme also results in Defendants' violation of the FLSA's minimum wage payment requirements, 29 U.S.C. § 206, because Defendants are paying a direct cash wage to table games dealers (including Plaintiffs) that is less than the required minimum wage, and, due to Defendants' non-compliance with the FLSA's tip-pooling provisions, Defendants are not entitled to any credit using employees' tips against its minimum wage obligation with respect to Plaintiffs, and other similarly situated employees.

54. Because Defendants' FLSA violations as alleged herein were neither sporadic nor infrequent, Defendants' tip pooling arrangement for table games dealers should be invalidated for the entire statutory look-back period of three (3) years. Alternatively, and at a minimum, Defendants' tip pooling arrangement for table games dealers should be invalidated as to any pay period during the statutory look-back period of three (3) years in which Defendants unlawfully kept and then improperly redistributed table games dealers' tips to pay PTO hours (or other forms of paid leave) accrued by Dual-Rate Supervisors in their employment as a floor supervisor.

55. As a result of Defendants' above-described FLSA violations, and pursuant to 29 U.S.C. § 216(b), Plaintiffs and other similarly situated employees are entitled to recover from Defendants the amount of the sum of (1) the tip credit taken (*i.e.*, the difference between the direct cash wage and the required federal minimum wage) / the amount of the unpaid minimum wages, (2) all tips that were unlawfully kept by Defendants and then improperly redistributed as payment of PTO hours (and other forms of paid leave) accrued by Dual-Rate

Case 4:19-cv-00358-GAF    Document 46    Filed 04/24/19    Page 21 of 51

Supervisors in their employment as a floor supervisor, and (3) an additional equal amount as liquidated damages.

56.     Defendants' FLSA violations alleged herein were willful in that Defendants either knew of the specific FLSA requirements and prohibitions at issue at the time of the alleged violations and intentionally did not comply with them, or showed reckless disregard for the matter of whether their conduct violated the FLSA.  By way of example, Defendants recognize, by their own pay policies, that Dual-Rate Supervisors are not permitted to participate in the table games dealers' tip pool for regular hours earned in their capacity as floor supervisors.  Under the circumstances, it demonstrates willful violations of the FLSA, or at least reckless disregard for the FLSA, to include other compensation (e.g., PTO, bereavement leave, sick leave, etc.) accrued by Dual-Rate Supervisors in their role as floor supervisors for payment from the table games dealers' tip pool.

57.     Plaintiffs and other similarly situated employees are also entitled under the FLSA, 29 U.S.C. § 216(b), to recover a reasonable attorney's fee to be paid by the Defendants, and costs of this action.

**Overview of Defendants' Unlawful Gaming License Deduction**

58.     Pinnacle has established a uniform or substantially similar gaming license deduction policy that governs employees at its casinos, including the casinos associated with the Pinnacle Subsidiary Defendants.

59.     Under this policy, Defendants deduct from their employees' wages the amount it costs Defendants to initially obtain and thereafter renew the employee's state-issued gaming license.  The amount it costs varies by state, but ranges from $20 to $350 per employee.

60.     Defendants' employees' state-issued gaming license is primarily for the benefit or convenience of Defendants.  Defendants' casinos exist in a heavily regulated environment. For example, Defendants can only have table games in their casinos if they are operated by employees (table games dealers) who have the required state-issued gaming license. These state-issued gaming licenses are specifically required for the employee's performance of the

employer's particular business. Without these state licensed employees, Defendants could not compliantly operate their casinos and, in turn, generate the revenues needed to support their operations and realize profits. Also, courts interpreting the requirements of 29 C.F.R. § 531.35 ("Free and clear" payment; "kickbacks") have drawn a line between costs arising from employment itself and those arising in the ordinary course of life. Costs that "primarily benefit the employee" are universally ordinary living expenses that one would incur in the course of life outside the workplace. Occupational licensing costs – like the state-issued gaming license at issue here – arise out of employment rather than the ordinary course of life. To that end, Plaintiffs have no use for their gaming license in the ordinary course of life outside the workplace. Therefore, Defendants' employees' state-issued gaming license primarily benefits the employer, not the employee, and are not deductible under the FLSA to the extent that they cut into the minimum or overtime wages required to be paid these employees.

61. For Defendants' many employees, like Plaintiffs, who are paid a direct cash wage of $7.25 per hour (the federally required minimum wage) or less, which include, among others, Defendants' tipped employees (like Plaintiffs) for whom Defendants pay a sub-minimum direct cash wage and claim an FLSA section 3(m) tip credit, this gaming license deduction is unlawful because it necessarily reduces the employee's earnings below the required minimum wage or overtime compensation in the workweeks in which Defendants make the deduction, resulting in violations of the FLSA.

62. As the Department of Labor has explained, when an employer claims an FLSA section 3(m) tip credit, the tipped employee is considered to have been paid only the minimum wage for all non-overtime hours worked in a tipped occupation and the employer may not take deductions because any such deduction reduces the tipped employee's wages below minimum wage.

63. By way of further explanation, under the FLSA, an employer's sub-minimum direct cash wage allowable for tipped employees must be at least $2.13 per hour, and the employer is able to count a limited amount of the employee's tips as a partial credit to satisfy

the difference between the direct cash wage and the required federal minimum wage (known as a "tip credit"). *See* 29 U.S.C. § 203(m)(2)(A). The credit allowed on account of tips may be less than that permitted by statute, but it cannot be more. Thus, as to Plaintiffs and other similarly situated employees who are tipped employees and paid a sub-minimum direct cash wage, any tips received by Plaintiffs and other similarly situated employees in excess of Defendants' maximum statutorily permitted tip credit cannot as a matter of law be claimed by Defendants when evaluating compliance with the FLSA's minimum wage and overtime compensation requirements.

64. Defendants have attempted to mislead their tipped employees into believing that Defendants' gaming license deduction never reduced their wages below minimum wage by providing a calculation that improperly includes an employee's tips in excess of the maximum permitted amount of the tip credit that Defendants could conceivably claim (assuming the tip pooling arrangement is valid – which it is not, at least as to the tip pooling arrangement among Defendants' table game dealers for the reasons alleged in this First Amended Complaint). Once Defendants' calculations are corrected to remove the employees' tips in excess of the statutorily permitted tip credit, it is readily apparent that Defendants' gaming license deduction always cuts into the minimum or overtime wages required to be paid them under the FLSA.

65. In a further attempt to mislead their employees, Defendants do not maintain (nor provide to their employees) payroll and timekeeping records that are segregated by workweek as contemplated by the FLSA. Instead, Defendants aggregate two workweeks into one pay period showing all wages and deductions as applied across the two workweeks and do not inform their employees (or maintain records reflecting) during which workweek they claim these deductions or what proportion of employees' wages were earned or hours worked in a particular workweek.

66. Remarkably, Defendants also claim their gaming license deduction policy is permissible on the basis of a July, 2008 Department of Labor Fact Sheet that discusses security

guards, which is an occupation that involves state-issued licenses that are portable from firm-to-firm. Defendants claim that because the DOL's Fact Sheet is silent on whether the cost of the state-issued security guard license can be deducted from the employee's wages, it must be acceptable for Defendants to deduct the cost of the state-issued gaming licenses required for their casino employees. Besides the unreasonableness of the conclusive inference that Defendants claim to have drawn from this Fact Sheet's mere silence, Defendants have also intentionally or recklessly ignored case law from the Southern District of New York in 2013 that expressly holds that the cost of a required state-issued security guard license is primarily for the benefit of the employer and, therefore, cannot be deducted from an employee's wages if the deduction reduces the employee's earnings below the required minimum wage or overtime compensation. *See Williams v. Secure Resource Communication Corp.*, 2013 WL 4828578 (S.D.N.Y. Sept. 10, 2013).

67.     As explained by the Court in *Williams*, the employer's subtraction of a $25 state-required security guard licensing fee from its employee's paycheck violated the FLSA's prohibition on employer deductions that bring an employee's wages below the FLSA's required minimum wage. The employee's first pay check was for four hours of pay at an hourly rate of $8, minus a $25 security guard licensing fee that the employer routinely deducted from all new employees' first pay checks. The statutorily prescribed minimum wage was $7.25 per hour; meaning the employer was required to pay this employee at least $29 for the employee's 4 total hours worked. Thus, as the Court explained, the employer's deduction of $25 from the employee's paycheck in order to pay for his state-issued license as a security guard – which the Court held was primarily for the benefit of the employer – violated the FLSA.

68.     The Court's analysis in *Williams* is directly applicable and establishes the unlawful nature of Defendants' gaming license deduction at issue here. As the Court in *Williams* explained:

        Under the FLSA, wages paid to an employee must meet the following standard:

> Whether in cash or in facilities, "wages" cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or "free and clear." The wage requirements of the [FLSA] will not be met where the employee "kicks-back" directly or indirectly to the employer ... for the employer's benefit the whole or part of the wage delivered to the employee.

29 C.F.R. § 531.35. Courts have interpreted this regulation to mean that the minimum wage requirement is not met if the employee incurs pre-employment expenses, primarily for the benefit of the employer, which reduce the employee's wages for their first workweek below the minimum wage rate. *Martinez Bautista v. D & S Produce*, 447 F.Supp.2d 954, 963 (E.D.Ark.2006); *see also, Arriaga v. Florida Pacific Farms*, 305 F.3d 1228, 1237 (11th Cir.2002).

Had Mr. Williams continued his employment with Secure Resources, he would have earned wages of $320.00 per 40 hour workweek. Secure Resources' $25.00 deduction would then have left him with $295.00 in wages during his first week, $5.00 more than the $290.00 minimum wage for a 40 hour week. Under those circumstances, the deduction would have been legal. Mr. Williams, however, worked only a single four hour half-shift. The FLSA-mandated minimum wage for that time was $29.00 dollars [$7.25 x 4], and pursuant to 29 C.F.R. § 531.35, any deduction primarily for the employer's benefit that reduced his wage below that number would violate the FLSA.

After deducting the cost of the security guard license from his paycheck, Secure Resources paid Mr. Williams only $4.00. **Thus, unless the cost of the license was primarily for Mr. Williams' benefit rather than for Secure Resources' benefit, he was not paid the statutory minimum wage. Courts**

**have drawn a line between costs arising from employment itself and those arising in the ordinary course of life.** *Arriaga*, **305 F.3d at 1242–43. "[C]osts that 'primarily benefit the employee' are universally ordinary living expenses that one would incur in the course of life outside the workplace."** *Id.* **(citing 29 C.F.R. § 531.32). Professional licensing costs arise out of employment rather than the ordinary course of life. They therefore primarily benefit the employer, not the employee, and are not deductible to the extent that they bring an employee's pay below the minimum wage.**

As discussed above, Mr. Williams was paid $25.00 less than the minimum wage. He therefore is entitled to recover $25.00 in unpaid wages plus an additional $25.00 in liquidated damages for a total of $50.00.

*Williams*, 2013 WL 4828578, at *5-6 (emphasis added).

69.     Consistent with the Court's analysis and holding in *Williams*, the Department of Labor announced in November, 2018 that it had completed an investigation and concluded that a casino operator's deductions made from employees' wages to cover its costs for individual employee's casino gaming licenses created minimum wage violations when those deductions brought the employee's pay below the federal minimum wage of $7.25 per hour.  In that case, the casino operator was required to pay $175,128 in back wages and damages to 889 employees at its casinos.

70.     Pursuant to 29 U.S.C. § 216(b), "Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." As Defendants violated the FLSA's minimum wage and/or overtime compensation provisions through an illegal gaming license deduction, each Plaintiff and all others similarly situated are entitled to recover their unpaid minimum wages or overtime compensation, along with an additional equal amount as liquidated damages.

71.     Defendants' FLSA violations alleged herein were willful in that Defendants either knew of the specific FLSA requirements and prohibitions at issue at the time of the alleged violations and intentionally did not comply with them, or showed reckless disregard for the matter of whether their conduct violated the FLSA.

72.     Plaintiffs and other similarly situated employees are also entitled under the FLSA, 29 U.S.C. § 216(b), to recover a reasonable attorney's fee to be paid by the Defendants, and costs of this action.

73.     Defendants deducted a gaming license fee in the amount of $125 (in $41.67 increments) from Plaintiff Dozier's wages across 3 pay periods between May 13, 2016 and June 23, 2016.  During this time, Plaintiff Dozier was paid a direct cash wage of $4.25 per hour.  Plaintiff Dozier has challenged the legality of the tip pool in which she participated, which means (as described above) Defendants are not entitled to claim credit for any tips that may have been paid to Plaintiff Dozier during these work weeks against their obligation to pay minimum wage under the FLSA.  Regardless of the legality of the tip pool, for purposes of the FLSA, Defendants claimed a tip credit only to bridge the gap between Plaintiff Dozier's direct cash wage of $4.25 per hour and the federal minimum wage of $7.25 per hour.  Under these circumstances and for purposes of the FLSA, any deduction from Plaintiff's wages, including the unlawful gaming license deduction at issue, violated the FLSA because it necessarily reduced her wages below the federal minimum wage for each hour worked.

74.     Defendants deducted a gaming license fee in the amount of $200 (in $50 increments) from Plaintiff Lonzo's wages across four pay periods between March 31, 2017 and May 25, 2017.  During this time, Plaintiff Lonzo was paid a direct cash wage of $5.47 per hour. Plaintiff Lonzo has challenged the legality of the tip pool in which she participated, which means (as described above) Defendants are not entitled to claim credit for any tips that may have been paid to Plaintiff Lonzo during these work weeks against their obligation to pay minimum wage under the FLSA.  Regardless of the legality of the tip pool, for purposes of the FLSA, Defendants claimed a tip credit only to bridge the gap between Plaintiff Lonzo's direct

cash wage and the federal minimum wage of $7.25 per hour. Under these circumstances and for purposes of the FLSA, any deduction from Plaintiff's wages, including the unlawful gaming license deduction at issue, violated the FLSA because it necessarily reduced her wages below the federal minimum wage for each hour worked.

75. Defendants deducted a gaming license fee in the amount of $50 (in $25 increments) from Plaintiff Kofron's wages across two pay periods between December 30, 2016 to January 26, 2017. During this time, Plaintiff Kofron was paid a direct cash wage of $7.07 per hour. Defendants also deducted a gaming license fee in the amount of $50 (in $25 increments) from Plaintiff Kofron's wages across two pay periods between December 29, 2017 to January 25, 2018. During this time, Plaintiff Kofron was paid a direct cash wage of $7.25 per hour. Plaintiff Kofron has challenged the legality of the tip pool in which she participated, which means (as described above) Defendants are not entitled to claim credit for any tips that may have been paid to Plaintiff Kofron during these work weeks against their obligation to pay minimum wage under the FLSA. Regardless of the legality of the tip pool, for purposes of the FLSA, Defendants claimed a tip credit only to bridge the gap between Plaintiff Kofron's direct cash wage and the federal minimum wage of $7.25 per hour. Under these circumstances and for purposes of the FLSA, any deduction from Plaintiff's wages, including the unlawful gaming license deduction at issue, violated the FLSA because it necessarily reduced her wages below the federal minimum wage for each hour worked.

76. Defendants deducted a gaming license fee in the amount of $20 from Plaintiff Sheffield's wages in one pay period between February 24, 2017 and March 9, 2017. During this time, Plaintiff Sheffield was paid a direct cash wage of $5.85 per hour. Plaintiff Sheffield has challenged the legality of the tip pool in which he participated, which means (as described above) Defendants are not entitled to claim credit for any tips that may have been paid to Plaintiff Sheffield during these work weeks against their obligation to pay minimum wage under the FLSA. Regardless of the legality of the tip pool, for purposes of the FLSA, Defendants claimed a tip credit only to bridge the gap between Plaintiff Sheffield's direct cash

wage and the federal minimum wage of $7.25 per hour. Under these circumstances and for purposes of the FLSA, any deduction from Plaintiff's wages, including the unlawful gaming license deduction at issue, violated the FLSA because it necessarily reduced her wages below the federal minimum wage for each hour worked.

77.     Defendants deducted a gaming license fee in the amount of $150 from Plaintiff Johnson's wages across three pay periods between June 30, 2017 and August 10, 2017. During this time, Plaintiff Johnson was paid a direct cash wage of $4.54 per hour. Plaintiff Johnson has challenged the legality of the tip pool in which she participated, which means (as described above) Defendants are not entitled to claim credit for any tips that may have been paid to Plaintiff Johnson during these work weeks against their obligation to pay minimum wage under the FLSA. Regardless of the legality of the tip pool, for purposes of the FLSA, Defendants claimed a tip credit only to bridge the gap between Plaintiff Johnson's direct cash wage and the federal minimum wage of $7.25 per hour. Under these circumstances and for purposes of the FLSA, any deduction from Plaintiff's wages, including the unlawful gaming license deduction at issue, violated the FLSA because it necessarily reduced her wages below the federal minimum wage for each hour worked.

78.     Defendants deducted a gaming license fee in the amount of $50 from Plaintiff Perez's wages in one pay period between March 11, 2016 and March 24, 2016. During this time, Plaintiff Perez was paid a direct cash wage of $4.50 per hour and $4.59 per hour (consistent with an annual wage increase, Plaintiff Perez's direct cash wage rate increased by $0.09 per hour at some point during the pay period). Plaintiff Perez has challenged the legality of the tip pool in which she participated, which means (as described above) Defendants are not entitled to claim credit for any tips that may have been paid to Plaintiff Perez during these work weeks against their obligation to pay minimum wage under the FLSA. Regardless of the legality of the tip pool, for purposes of the FLSA, Defendants claimed a tip credit only to bridge the gap between Plaintiff Perez's direct cash wage and the federal minimum wage of $7.25 per hour. Under these circumstances and for purposes of the FLSA, any deduction from

Plaintiff's wages, including the unlawful gaming license deduction at issue, violated the FLSA because it necessarily reduced her wages below the federal minimum wage for each hour worked.

79. Defendants deducted a gaming license fee in the amount of $50 from Plaintiff Mitchell's wages across one pay period between August 26, 2016 and September 8, 2016. During this time, Plaintiff Mitchell was paid a direct cash wage of $4.75 per hour. Defendants also deducted a gaming license fee in the amount of $50 from Plaintiff Mitchell's wages across one pay period between August 25, 2017 and September 7, 2017. During this time, Plaintiff Mitchell was paid a direct cash wage of $4.84 per hour. Plaintiff Mitchell has challenged the legality of the tip pool in which he participated, which means (as described above) Defendants are not entitled to claim credit for any tips that may have been paid to Plaintiff Mitchell during these work weeks against their obligation to pay minimum wage under the FLSA. Regardless of the legality of the tip pool, for purposes of the FLSA, Defendants claimed a tip credit only to bridge the gap between Plaintiff Mitchell's direct cash wage and the federal minimum wage of $7.25 per hour. Under these circumstances and for purposes of the FLSA, any deduction from Plaintiff's wages, including the unlawful gaming license deduction at issue, violated the FLSA because it necessarily reduced her wages below the federal minimum wage for each hour worked.

### CLASS AND COLLECTIVE ACTION ALLEGATIONS

80. Plaintiffs re-allege and incorporate by reference the allegations set forth above.

81. Plaintiffs bring Cause of Action One, the FLSA claim arising out of Defendants' violation of the FLSA's tip pool provisions, as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b) on behalf of themselves individually and the following similarly situated collective action class:

**Fair Labor Standards Act Unlawful Tip Pool Collective**

All persons employed as a table games dealer and included within a tip pooling arrangement at Pinnacle casinos Ameristar Council Bluffs, Ameristar East

Chicago, Cactus Pete's, Boomtown New Orleans, L'Auberge Baton Rouge, Boomtown Bossier City, L'Auberge Lake Charles, River City, Ameristar Vicksburg, or The Meadows, at any time from February 21, 2016 to the present.

82.    Plaintiffs bring Cause of Action Two, the FLSA claim arising out of Defendants' unlawful gaming license deduction policy, as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b) on behalf of themselves individually and the following collective action class:

**Fair Labor Standards Act Gaming License Deduction Policy Collective**

> All persons employed and paid a direct cash wage of $7.25 per hour or less at Pinnacle casinos Ameristar Council Bluffs, Ameristar East Chicago, Cactus Pete's, Boomtown New Orleans, L'Auberge Baton Rouge, Boomtown Bossier City, L'Auberge Lake Charles, River City, Ameristar Vicksburg, or The Meadows, and for whom a deduction was taken from their wages for any amount associated with initially obtaining or thereafter renewing a state-issued gaming license, at any time from February 21, 2016 to the present.

83.    Plaintiffs' FLSA claims (Causes of Action One and Two, *infra*) may be pursued by those who opt-in to this case, pursuant to 29 U.S.C. § 216(b).

84.    Plaintiffs, individually and on behalf of all others similarly situated, seek relief on a collective basis challenging Defendants' above-described FLSA violations. The number and identity of other plaintiffs yet to opt-in and consent to be party plaintiffs may be determined from Defendants' records, and potential opt-in plaintiffs may easily and quickly be notified of the pendency of this action.

85.    Plaintiff Kofron brings Cause of Action Three, the Missouri Minimum Wage Law claim arising out of Defendants' unlawful gaming license deduction policy, as a class action under Fed. R. Civ. P. 23, on behalf of herself and the following class:

///

///

**Missouri Minimum Wage Law – Minimum Wage Rule 23 Class**

All persons employed and paid a direct cash wage equal to or less than the then-applicable minimum wage in Missouri ($8.60 per hour during 2019, $7.85 per hour during 2018, or $7.70 per hour during 2017) at Pinnacle casino River City, and for whom a deduction was taken from their wages for any amount associated with initially obtaining or thereafter renewing a state-issued gaming license, at any time from February 21, 2017 to the present.

86.    Plaintiff Sheffield brings Cause of Action Four, the Iowa Wage Payment Collection Law claim arising out of Defendants' gaming license deduction policy (as an unlawful deduction under the Iowa Wage Payment Collection Law), as a class action under Fed. R. Civ. P. 23, on behalf of himself and the following class:

**Iowa Wage Payment Collection Law – Unlawful Deduction Rule 23 Class**

All persons employed at Pinnacle casino Ameristar Council Bluffs, and for whom a deduction was taken from their wages for any amount associated with initially obtaining or thereafter renewing a state-issued gaming license, at any time from February 21, 2017 to the present.

87.    Plaintiff Sheffield brings Cause of Action Five, the Iowa Wage Payment Collection Law claim arising out of Defendants' gaming license deduction policy (as unlawfully reducing wages below the $7.25 minimum set by the Iowa Minimum Wage Law, which is enforced by the Iowa Wage Payment Collection Law), as a class action under Fed. R. Civ. P. 23, on behalf of himself and the following class:

**Iowa Wage Payment Collection Law – Minimum Wage Rule 23 Class**

All persons employed and paid a direct cash wage of $7.25 per hour or less at Pinnacle casino Ameristar Council Bluffs, and for whom a deduction was taken from their wages for any amount associated with initially obtaining or thereafter renewing a state-issued gaming license, at any time from February 21, 2017 to the present.

88.     Plaintiffs' Rule 23 claims, described in detail below, satisfy the numerosity, commonality, typicality, adequacy, and superiority requirements of a class action pursuant to Fed. R. Civ. P. 23.

89.     These classes each number in the thousands of persons.  As a result, joinder of all class members in a single action is impracticable.  Class members may be informed of the pendency of this action through regular mail, e-mail, and/or posting of an approved notice.

90.     There are common questions of fact and law to the classes that predominate over any questions affecting only individual class members.  The questions of law and fact common to the classes arising from Defendants' actions include, without limitation, the following:

      a.     Whether Defendants' employees' state-issued gaming license is primarily for Defendants' benefit or convenience;

      b.     Whether Defendants' gaming license fee deductions cut into the minimum or overtime wages required to be paid these employees;

      c.     Whether Defendants' gaming license deduction policy constitutes a willful violation by Defendants of applicable laws.

91.     The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness, and equity to other available methods for the fair and efficient adjudication of the state law claims.

92.     Plaintiffs' claims are typical of those of the respective classes in that class members have been employed in the same or similar position as Plaintiffs and were subject to the same or similar unlawful policies and practices as Plaintiffs.

93.     A class action is the superior method for the fair and efficient adjudication to Plaintiffs' claims.  Defendants have acted or refused to act on grounds generally applicable to the classes.  The presentation of separate actions by individual class members could create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for

Defendants, and/or substantially impair or impede the ability of class members to protect their interests.

94. Plaintiffs are adequate representatives because each Plaintiff is a member of each of the respective classes that each Plaintiff seeks to represent, and each Plaintiff's interests do not conflict with the interests of the members of those classes. The interests of the members of the classes will be fairly and adequately protected by Plaintiffs and Plaintiffs' undersigned counsel, who are experienced prosecuting complex wage and hour, employment, and class action litigation.

95. Maintenance of this action is a class action is a fair and efficient method for adjudication of this controversy. It would be impracticable and undesirable for each member of the classes who suffered harm to bring a separate action. In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all class members.

## ALLEGATIONS APPLICABLE TO ALL FLSA CLAIMS

96. At all relevant times, Plaintiffs and all others similarly situated have been entitled to the rights, protections, and benefits provided under the FLSA, 29 U.S.C. § 201, *et seq*.

97. The FLSA regulates, among other things, the payment of minimum wage and overtime pay by employers whose employees are engaged in interstate commerce, or engaged in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce. *See* 29 U.S.C. § 206(a); 29 U.S.C. § 207(a)(1).

98. Defendants are subject to the minimum wage and overtime pay requirements of the FLSA because they are each enterprises engaged in interstate commerce and their employees are engaged in commerce. At all relevant times, each Defendant is or has been an enterprise engaged in commerce or in the production of goods or services for commerce within

the meaning of 29 U.S.C. § 203(s)(1), and, upon information and belief, has had an annual gross volume of sales made or business done of not less than $500,000.

99. At all relevant times, Defendants were "employers" of Plaintiffs and all similarly situated employees within the meaning of the FLSA. *See* 29 U.S.C. § 203(d).

100. At all relevant times, Plaintiffs and all similarly situated employees were Defendants' "employees" within the meaning of the FLSA. *See* 29 U.S.C. § 203(e).

101. Plaintiffs and all similarly situated employees are covered, non-exempt employees within the meaning of the FLSA. Accordingly, Plaintiffs and all similarly situated employees must be paid minimum wages in accordance with 29 U.S.C. § 206.

102. Pursuant to the FLSA, employees are also entitled to be compensated at a rate of not less than one and one-half times the regular rate at which such employees are employed for all work performed in excess of 40 hours in a workweek. *See* 29 U.S.C. § 207(a).

103. Although the FLSA contains some exceptions (or exemptions) from the minimum wage and overtime requirements, none of those exceptions (or exemptions) apply here.

104. Plaintiffs and all similarly situated employees are victims of uniform or substantially similar compensation policies and practices.

105. Plaintiffs and all similarly situated employees are entitled to damages equal to the mandated minimum wage within the three (3) years preceding the filing of the original Class and Collective Action Complaint (*see* ECF No. 1), plus periods of equitable tolling, because, as described above, Defendants acted willfully and knew, or showed reckless disregard of, whether their conduct was prohibited by the FLSA.

106. Defendants have acted neither in good faith nor with reasonable grounds to believe that their actions and omissions were not a violation of the FLSA, and as a result, Plaintiffs and other similarly situated employees are entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid wages as described by Section 16(b) of the FLSA, codified at 29 U.S.C. § 216(b). Alternatively, should the Court find Defendants

acted in good faith or with reasonable grounds in failing to pay minimum wage, Plaintiffs and all similarly situated employees are entitled to an award of prejudgment interest at the applicable legal rate.

107.    As a result of these violations of the FLSA's minimum wage provisions, compensation has been unlawfully withheld by Defendants from Plaintiffs and all similarly situated employees.  Accordingly, pursuant to 29 U.S.C. § 216(b), Defendants are liable for the unpaid minimum wages along with an additional amount as liquidated damages, pre-judgment and post-judgment interest, reasonable attorneys' fees, and costs of this action.

### FIRST CAUSE OF ACTION

### Violation of the Fair Labor Standards Act

### Arising Out of Defendants' Violation of the FLSA Tip Pooling Provisions

### Asserted Against All Defendants

108.    Plaintiffs re-allege and incorporate by reference the allegations set forth above.

109.    Defendants' above-described (*see* Paragraphs 42-57 above, which are incorporated herein by reference) scheme for the payment of PTO hours (and other forms of paid leave) for Dual-Rate Supervisors is unlawful and violates the FLSA's tip-pooling provisions because (1) Defendants are violating the FLSA's requirement that all tips received by the tipped employee must be retained by the employee except for a valid tip pooling arrangement; (2) Defendants are violating the FLSA's prohibition against the pooling of tips among employees who do not customarily and regularly receive tips; and (3) Defendants are violating the FLSA's requirement that it "not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of the employees' tips, regardless of whether or not the employer takes a tip credit" – *see* 29 U.S.C. § 203(m), as amended by the Consolidated Appropriations Act, 2018 (signed March 23, 2018), along with such section as was in effect prior to then, and all applicable regulations (as the position titles Dual-Rate Supervisor and Floor Supervisor confirm, when Dual-Rate Supervisors are

1  performing their non-tipped supervisory duties they are "managers or supervisors" within the
2  meaning of the FLSA).

3  110.   Defendants' above-described scheme also results in Defendants' violation of
4  the FLSA's minimum wage payment requirements, 29 U.S.C. § 206, because Defendants are
5  paying a direct cash wage to table games dealers that is less than the required minimum wage,
6  and, due to Defendants' non-compliance with the FLSA's tip-pooling provisions, Defendants
7  are not entitled to any credit using employees' tips against its minimum wage obligation with
8  respect to Plaintiffs.

9  111.   Because Defendants' FLSA violations as alleged herein were neither sporadic
10  nor infrequent, Defendants' tip pooling arrangement for table games dealers should be
11  invalidated for the entire statutory look-back period of three (3) years.  Alternatively, and at a
12  minimum, Defendants' tip pooling arrangement for table games dealers should be invalidated
13  as to any pay period during the statutory look-back period of three (3) years in which
14  Defendants unlawfully kept and then improperly redistributed table games dealers' tips to pay
15  PTO hours (or other forms of paid leave) accrued by Dual-Rate Supervisors in their
16  employment as a floor supervisor.

17  112.   As a result of Defendants' above-described FLSA violations, and pursuant to
18  29 U.S.C. § 216(b), Plaintiffs and other similarly situated employees are entitled to recover
19  from Defendants the amount of the sum of (1) the tip credit taken (*i.e.*, the difference between
20  the direct cash wage and the required federal minimum wage) / the amount of the unpaid
21  minimum wages, (2) all tips that were unlawfully kept by Defendants and then improperly
22  redistributed as payment of PTO hours (and other forms of paid leave) accrued by Dual-Rate
23  Supervisors in their employment as a floor supervisor, and (3) an additional equal amount as
24  liquidated damages.

25  113.   Defendants' FLSA violations alleged herein were willful in that Defendants
26  either knew of the specific FLSA requirements and prohibitions at issue at the time of the
27  alleged violations and intentionally did not comply with them, or showed reckless disregard

for the matter of whether their conduct violated the FLSA.  By way of example, Defendants recognize, by their own pay policies, that Dual-Rate Supervisors are not permitted to participate in the table games dealers' tip pool for regular hours earned in their capacity as floor supervisors.  Under the circumstances, it demonstrates willful violations of the FLSA, or at least reckless disregard for the FLSA, to include other compensation (e.g., PTO, bereavement leave, sick leave, etc.) accrued by Dual-Rate Supervisors in their role as floor supervisors for payment from the table games dealers' tip pool.

114.   Plaintiffs and other similarly situated employees are also entitled under the FLSA, 29 U.S.C. § 216(b), to recover a reasonable attorney's fee to be paid by the Defendants, and costs of this action.

**WHEREFORE**, on this First Cause of Action of the First Amended Complaint, Plaintiffs and all similarly situated employees demand judgment against Defendants and pray this Court:

    a.   Issue notice to all similarly situated employees of Defendants informing them of their right to file consents to join the FLSA portion of this action;

    b.   Award Plaintiffs  compensatory damages in the form of the tip credit taken (*i.e.*, the difference between the direct cash wage and the required federal minimum wage) / the amount of the unpaid minimum wages and all tips that were unlawfully kept by Defendants and then improperly redistributed as payment of PTO hours (and other forms of paid leave) accrued by Dual-Rate Supervisors in their employment as a floor supervisor;

    c.   Award Plaintiffs and all similarly situated employees liquidated damages under 29 U.S.C. § 216(b);

    d.   Award Plaintiffs and all similarly situated employees pre-judgment and post-judgment interest as provided by law;

e.    Award Plaintiffs and all similarly situated employees attorneys' fees and costs under 29 U.S.C. § 216(b); and

f.    Award Plaintiffs and all similarly situated employees such other relief as the Court deems fair and equitable.

### SECOND CAUSE OF ACTION

### Violation of the Fair Labor Standards Act

### Arising Out of Defendants' Gaming License Fee Deduction Policy

### Asserted Against All Defendants

115.    Plaintiffs re-allege and incorporate by reference the allegations set forth above.

116.    Pinnacle has established a uniform or substantially similar gaming license deduction policy that governs employees at its casinos, including the casinos associated with the Pinnacle Subsidiary Defendants.

117.    Under this policy, Defendants deduct from their employees' wages the amount it costs Defendants to initially obtain and thereafter renew the employee's state-issued gaming license.  The amount it costs varies by state, but ranges from $20 to $350 per employee.

118.    As more fully described above in Paragraphs 58-79, which is incorporated herein by reference, Defendants' employees' state-issued gaming license is primarily for the benefit or convenience of Defendants.  Costs that "primarily benefit the employee" are universally ordinary living expenses that one would incur in the course of life outside the workplace. Occupational licensing costs – like the state-issued gaming license at issue here – arise out of employment rather than the ordinary course of life. They therefore primarily benefit the employer, not the employee, and are not deductible under the FLSA to the extent that they cut into the minimum or overtime wages required to be paid these employees under the FLSA.  Here, as described above, Plaintiffs are paid a direct cash wage below the federal minimum wage.  As such, any deduction from Plaintiffs' wages, including the unlawful gaming license deduction at issue here, necessarily reduces their compensation below the FLSA's minimum wage of $7.25 per hour.

Case 4:19-cv-00358-GAF    Document 46    Filed 04/24/19    Page 40 of 51

119.     Pursuant to 29 U.S.C. § 216(b), "Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." As Defendants violated the FLSA's minimum wage and/or overtime compensation provisions through an illegal gaming license deduction, each Plaintiff and all others similarly situated are entitled to recover their unpaid minimum wages or overtime compensation, along with an additional equal amount as liquidated damages.

120.     As more fully described above in Paragraphs 64-69, which is incorporated herein by reference, Defendants' FLSA violations alleged herein were willful in that Defendants either knew of the specific FLSA requirements and prohibitions at issue at the time of the alleged violations and intentionally did not comply with them, or showed reckless disregard for the matter of whether their conduct violated the FLSA.

121.     Plaintiffs and other similarly situated employees are also entitled under the FLSA, 29 U.S.C. § 216(b), to recover a reasonable attorney's fee to be paid by the Defendants, and costs of this action.

**WHEREFORE**, on this Second Cause of Action of the First Amended Complaint, Plaintiffs and all similarly situated employees demand judgment against Defendants and pray this Court:

a.     Issue notice to all similarly situated employees of Defendants informing them of their right to file consents to join the FLSA portion of this action;

b.     Award Plaintiffs and all similarly situated employees damages for unpaid minimum wages and unpaid overtime wages under 29 U.S.C. § 216(b) as a result of the deductions at issue;

c.     Award Plaintiffs and all similarly situated employees liquidated damages under 29 U.S.C. § 216(b);

d.　　Award Plaintiffs and all similarly situated employees pre-judgment and post-judgment interest as provided by law;

e.　　Award Plaintiffs and all similarly situated employees attorneys' fees and costs under 29 U.S.C. § 216(b); and

f.　　Award Plaintiffs and all similarly situated employees such other relief as the Court deems fair and equitable.

## THIRD CAUSE OF ACTION

### Violation of the Missouri Minimum Wage Law

**Arising Out of Defendants' Gaming License Fee Deduction Policy**

**Asserted Against Defendants Pinnacle Entertainment, Inc. and PNK (River City), LLC**

122.　　Plaintiff Kofron re-alleges and incorporates by reference the allegations set forth above.

123.　　Plaintiff Kofron, on behalf of herself and the Missouri MMWL Rule 23 Class (referenced in this Cause of Action as the "Class"), asserts this cause of action pursuant to the Missouri Minimum Wage Law ("MMWL"), Mo. Stat. Ann. § 290.500, *et seq*., against Defendants Pinnacle Entertainment, Inc. and PNK (River City), LLC.

124.　　At all relevant times, Plaintiff Kofron and the class members have been entitled to the rights, protections, and benefits provided under the MMWL.

125.　　The MMWL regulates, among other things, the payment of minimum wage and overtime wages by employers, subject to limited exceptions not applicable herein, and provides or has provided for during part or all of the applicable limitations period for a higher minimum wage than that provided for under federal law. *See* Mo. Stat. Ann. §§ 290.500(3-4), 290.505.1.

126.　　The MMWL should be construed in accordance with its provisions and those of the FLSA. Specifically, the Missouri Department of Labor has promulgated regulations providing that except as otherwise provided by Missouri law, the interpretation and

Case 4:19-cv-00358-GAF　　Document 46　　Filed 04/24/19　　Page 42 of 51

enforcement of the MMWL follows the FLSA and its companion regulations. *See* 8 C.S.R. § 30-4.010(1).

127.     At all relevant times, Defendants Pinnacle Entertainment, Inc. and PNK (River City), LLC were the "employer" of Plaintiff Kofron and the class members within the meaning of the MMWL. *See* Mo. Stat. Ann. §§ 290.500(3-4).

128.     At all relevant times, Plaintiff Kofron and the class members were Defendants Pinnacle Entertainment, Inc. and PNK (River City), LLC's "employees" within the meaning of the MMWL. *See* Mo. Stat. Ann. § 290.500(3).

129.     Plaintiff Kofron and the class members are covered, non-exempt employees within the meaning of the MMWL. Accordingly, employees are entitled to be paid at least minimum wage for all hours worked in each workweek. *See* Mo. Stat. Ann. § 290.502.1.

130.     Although the MMWL contains some exceptions (or exemptions) from the minimum wage, none of those exceptions (or exemptions) apply here. *See* Mo. Stat. Ann. § 290.500(3).

131.     Plaintiff Kofron and the class members are victims of uniform or substantially similar employer-based compensation policies and practices.

132.     Specifically, Defendants violated the MMWL by making deductions from the wages of Plaintiff Kofron and the Class for gaming license fee that, as described above, primarily benefited Defendants, which reduced their wages below the federally and state required minimum wages and caused them to be underpaid overtime wages.

133.     Specifically, Defendants deducted a gaming license fee in the amount of $50 (in $25 increments) from Plaintiff Kofron's wages across two pay periods between December 29, 2017 and January 25, 2018. During this time, Plaintiff Kofron was paid a direct cash wage of $7.25 per hour and the Missouri minimum wage was $7.70 (during 2017) and $7.85 (during 2018). Plaintiff Kofron has challenged the legality of the tip pool in which she participated, which means (as described above) Defendants are not entitled to claim credit for any tips that may have been paid to Plaintiff Kofron during these work weeks against their obligation to pay

minimum wage under the MMWL. Further, and regardless of the legality of the tip pool, Defendants claimed a tip credit, for purposes of the MMWL, sufficient only to satisfy the applicable minimum wage. Under these circumstances, any deduction from Plaintiff's wages, including the gaming license fee deduction at issue here, violated the MMWL because it necessarily reduced her wages below the applicable minimum wage for each hour worked.

134.    Plaintiff Kofron and the Class are entitled to damages equal to all unpaid minimum and overtime wages due within two (2) years preceding the filing of the initial Complaint (*see* ECF No. 1), plus periods of equitable tolling, along with an additional equal amount as liquidated damages. *See* Mo. Stat. Ann. § 290.527.

135.    Plaintiff Kofron and the Class are also entitled to an award of pre-judgment and post-judgment interest at the applicable legal rate.

136.    Defendants are also liable to Plaintiff Kofron and the Class for costs and reasonable attorney fees incurred in this action. *See* Mo. Stat. Ann. § 290.527.

**WHEREFORE**, on this Third Cause of Action of the First Amended Complaint, Plaintiff Kofron and the Class demand judgment against Defendants and pray this Court:

a.    Certify the state law claim set forth in this Cause of Action as a class action pursuant to Fed. R. Civ. P. 23;

b.    Award Plaintiff Kofron and the Class damages for unpaid minimum wages and overtime wages under Mo. Stat. Ann. § 290.527 as a result of the deductions at issue;

c.    Award Plaintiff Kofron and the Class liquidated damages under Mo. Stat. Ann. § 290.527;

d.    Award Plaintiff Kofron and the Class pre-judgment and post-judgment interest as provided by law;

e.    Award Plaintiff Kofron and the Class' counsel attorneys' fees and costs as allowed by Mo. Stat. Ann. § 290.527; and

f. Award Plaintiff Kofron and the Class such other relief as the Court deems fair and equitable.

## FOURTH CAUSE OF ACTION

### Violation of the Iowa Wage Payment Collection Law

**Arising Out of Defendants' Gaming License Fee Deduction Policy – Unlawful Deduction Asserted Against Defendants Pinnacle Entertainment, Inc. and Ameristar Casino Council Bluffs, LLC**

137. Plaintiff Sheffield re-alleges and incorporates by reference the allegations set forth above.

138. Plaintiff Sheffield, on behalf of himself and the Iowa Wage Payment Collection Law – Unlawful Deduction Rule 23 Class (referenced in this Cause of Action as the "Class"), assert this cause of action pursuant to the Iowa Wage Payment Collection Law ("IWPCL"), Iowa Code Ann. § 91A.1, *et seq*., against Defendants Pinnacle Entertainment, Inc. and Ameristar Casino Council Bluffs, LLC.

139. Plaintiff Sheffield and the Class assert this IWPCL claim because the gaming license deductions at issue in this case constitute an unlawful deduction under the IWPCL that accrues to the benefit of the employer (Defendants) and not the employee (Plaintiff Sheffield and the Class). *See* Iowa Code Ann. § 91A.5(1)(b).

140. At all relevant times, Plaintiff Sheffield and the Class constituted Defendants' "employees" within the meaning of the IWPCL. *See* Iowa Code Ann. § 91A.2(3).

141. At all relevant times, Defendants constituted Plaintiff Sheffield's and the Class' "employers" within the meaning of the IWPCL. *See* Iowa Code Ann. § 91A.2(4).

142. Plaintiff Sheffield and the Class are victims of uniform or substantially similar employer-based compensation policies and practices.

143. Specifically, Defendants violated the IWPCL by making deductions from the wages of Plaintiff Sheffield and the Class for a state-issued gaming license fee, which are fees that, as described above, accrue to the benefit of the employer and not the employee.

Defendants unlawfully deducted a gaming license fee in the amount of $20 from Plaintiff Sheffield's wages in one pay period between February 24, 2017 and March 9, 2017.

144. Defendants were not permitted to make these deductions pursuant to the IWPCL. *See* Iowa Code Ann. § 91A.5.

145. Defendants are not permitted to withhold these payroll deductions by any state or federal law or court order. *See* Iowa Code Ann. § 91A.5.

**WHEREFORE**, on this Fourth Cause of Action of the First Amended Complaint, Plaintiff Sheffield and the Class demand judgment against Defendants and pray this Court:

    a.    Certify the state law claim set forth in this Cause of Action as a class action pursuant to Fed. R. Civ. P. 23;

    b.    Award Plaintiff Sheffield and the Class damages for unlawful payroll deductions;

    c.    Award Plaintiff Sheffield and the Class' counsel attorneys' fees and costs as allowed by Iowa Code Ann. § 91A.8; and

    d.    Award Plaintiff Sheffield and the Class liquidated damages as allowed by Iowa Code Ann. § 91A.8;

    e.    Award Plaintiff Sheffield and the Class pre-judgment and post-judgment interest as provided by law;

    f.    Award Plaintiff Sheffield and the Class such other relief as the Court deems fair and equitable.

## FIFTH CAUSE OF ACTION

### Violation of the Iowa Wage Payment Collection Law

### Arising Out of Defendants' Gaming License Fee Deduction Policy – Minimum Wage

### Asserted Against Defendants Pinnacle Entertainment, Inc. and Ameristar Casino

### Council Bluffs, LLC

146. Plaintiff Sheffield re-alleges and incorporates by reference the allegations set forth above.

Page **46** of **51**

147.    Plaintiff Sheffield, on behalf of himself and the Iowa Wage Payment Collection Law – Minimum Wage Rule 23 Class (referenced in this Cause of Action as the "Class"), assert this cause of action pursuant to the Iowa Wage Payment Collection Law ("IWPCL"), Iowa Code Ann. § 91A.1, *et seq*., against Defendants Pinnacle Entertainment, Inc. and Ameristar Casino Council Bluffs, LLC.

148.    Iowa's Minimum Wage Law is enforced pursuant to the Iowa Wage Payment Collection Law. *See* Iowa Code Ann. § 91D.1(4).

149.    Iowa's Minimum Wage Law requires that employees be paid a minimum hourly wage of $7.25 consistent with the terms of the FLSA. *See* Iowa Code Ann. § 91D.1(1)(a).

150.    Iowa's Minimum Wage Law has adopted the FLSA's definition of employer, employee, and the concept of employment triggering the FLSA's (and the Iowa Minimum Wage Law's) provisions. *See* Iowa Code Ann. § 91D.1(1)(b).

151.    Plaintiff Sheffield and the Class assert this IWPCL claim because the unlawful gaming license deductions at issue in this case have reduced their wages below the minimum required by Iowa's Minimum Wage Law (*i.e*., $7.25 per hour). *See* Iowa Code Ann. §§ 91D.1(1)(b), 91A.5(1)(b).

152.    At all relevant times, Plaintiff Sheffield and the Class constituted Defendants' "employees" within the meaning of Iowa's Minimum Wage Law and the IWPCL. *See* Iowa Code Ann. §§ 91D.1(1)(b), 91A.2(3).

153.    At all relevant times, Defendants constituted Plaintiff Sheffield's and the Class' "employers" within the meaning of Iowa's Minimum Wage Law and the IWPCL. *See* Iowa Code Ann. §§ 91D.1(1)(b), 91A.2(4).

154.    Plaintiff Sheffield and the Class are victims of uniform or substantially similar employer-based compensation policies and practices.

155.    Specifically, Defendants violated Iowa's Minimum Wage Law and, as a result, the IWPCL by making deductions from the wages of Plaintiff Sheffield and the Class for

gaming license fees, which reduced their wages below the applicable minimum wage of $7.25 per hour. Defendants deducted a gaming license fee in the amount of $20 from Plaintiff Sheffield's wages in one pay period between February 24, 2017 and March 9, 2017. During this time, Plaintiff Sheffield was paid a direct cash wage of $5.85 per hour. Plaintiff Sheffield has challenged the legality of the tip pool in which he participated, which means (as described above) Defendants are not entitled to claim credit for any tips that may have been paid to Plaintiff Sheffield during these work weeks against their obligation to pay minimum wage under the Iowa Minimum Wage Law and IWPCL. Further, and regardless of the legality of the tip pool, Defendants claimed a tip credit only to bridge the gap between Plaintiff Sheffield's direct cash wage and the federal minimum wage of $7.25 per hour. Under these circumstances, any deduction from Plaintiff's wages, including the gaming license fee deduction at issue here, violated the Iowa Minimum Wage Law and the IWPCL because it necessarily reduced his wages below the federal minimum wage for each hour worked. Likewise, as described above, the gaming license fee deductions at issue accrue to the benefit of the employer (Defendants) and not the employee (Plaintiff Sheffield and the Class), which renders them impermissible deductions to the extent they reduce wages below the applicable minimum wage.

**WHEREFORE**, on this Fifth Cause of Action of the First Amended Complaint, Plaintiff Sheffield and the Class demand judgment against Defendants and pray this Court:

      a.    Certify the state law claim set forth in this Cause of Action as a class action pursuant to Fed. R. Civ. P. 23;

      b.    Award Plaintiff Sheffield and the Class damages for unpaid minimum wages arising out of the deductions at issue;

      c.    Award Plaintiff Sheffield and the Class' counsel attorneys' fees and costs as allowed by Iowa Code Ann. § 91A.8; and

      d.    Award Plaintiff Sheffield and the Class liquidated damages as allowed by Iowa Code Ann. § 91A.8;

1         e.     Award Plaintiff Sheffield and the Class pre-judgment and post-

2             judgment interest as provided by law;

3         f.     Award Plaintiff Sheffield and the Class such other relief as the Court

4             deems fair and equitable.

5             **<u>DEMAND FOR JURY TRIAL</u>**

6       Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby request a trial by jury

7  of all issues so triable.

8  Dated: April 24, 2019     Respectfully submitted:

9                 **HKM EMPLOYMENT ATTORNEYS LLP**
                  */s/ Jenny Foley*

10                **JENNY L. FOLEY, Ph.D., ESQ.**
                  Nevada Bar No.: 9017

11                E-mail:jfoley@hkm.com
                  **MARTA D. KURSHUMOVA, ESQ.**

12                Nevada Bar No.: 14728
                  E-mail:mkurshumova@hkm.com

13                1785 East Sahara, Suite 300
                  Las Vegas, Nevada 89104

14                Tel.:   (702) 805-8340

15                Fax:   (702) 625-3893

16                **AND**

17                **STUEVE SIEGEL HANSON LLP**

18                */s/ George A. Hanson*
                  **GEORGE A. HANSON, ESQ.**, *pro hac vice*

19                Missouri Bar No.: 43450
                  E-mail:hanson@stuevesiegel.com

20                **ALEXANDER T. RICKE, ESQ.**, *pro hac vice*

21                Missouri Bar No.: 65132
                  E-mail:ricke@stuevesiegel.com

22                460 Nichols Road, Suite 200
                  Kansas City, Missouri 64112

23                Tel.:   (816) 714-7100
                  Fax:   (816) 714-7101

24

25                **AND**

26

27

**McCLELLAND LAW FIRM, P.C.**
*/s/ Ryan L. McClelland*

**RYAN L. MCCLELLAND, ESQ.**, *pro hac vice*
Missouri Bar No.: 59343
E-mail:ryan@mcclellandlawfirm.com
**MICHAEL J. RAHMBERG, ESQ.**, *pro hac vice*
Missouri Bar No.: 66979
E-mail:mrahmberg@mcclellandlawfirm.com
The Flagship Building
200 Westwoods Drive
Liberty, Missouri 64068-1170
Tel.:    (816) 781-0002
Fax:    (816) 781-1984

**AND**
**OSMAN & SMAY LLP**
*/s/ Matthew E. Osman*

**MATTHEW E. OSMAN, ESQ.**, *pro hac vice*
Missouri Bar No.: 60137
E-mail: mosman@workerwagerights.com
**KATHRYN S. RICKLEY, ESQ.**, *pro hac vice*
Missouri Bar No.: 59435
E-mail: krickley@workerwagerights.com
8500 W. 110th Street, Suite 330
Overland Park, Kansas 66210
Tel.:    (913) 667-9243
Fax:    (866) 470-9243

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of April 2019, I caused to be served a true and correct copy of the foregoing **PLAINTIFFS' FIRST AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT AND JURY DEMAND** on the following persons as follows:

\_\_\_	by placing the same for mailing in the United States Mail, in a sealed envelope on which first class postage was prepaid in Las Vegas, Nevada and/or

X	to be sent via electronic filing with the Clerk of the Court using the Court's electronic filing system and serving all parties with an email address of record who have agreed to receive Electronic Service in this action

\_\_\_	to be hand delivered to the persons and/or addresses below:


_/s/ Ciara Contreras_

An Employee of HKM EMPLOYMENT ATTORNEYS LLP